STATE of Tennessee ex rel. Howard Trent WOOD and Flora Mae Wood, Appellants,

v.

CITY OF MEMPHIS, Appellee.

Supreme Court of Tennessee.

June 3, 1974.

Crislip & Blount, James A. Crislip, Gary K. Smith, Memphis, for appellants.

Allen T. Malone, Art Shea, Asst. City Attys., Frierson M. Graves, Jr., City Atty., Memphis, for appellee; Apperson, Crump, Duzane & Maxwell, Memphis, of counsel.

## OPINION

LEECH, Special Justice.

This suit is an attack upon the validity of an ordinance of the City of Memphis which annexed certain territory thereto pursuant to T.C.A. § 6–309. Having analyzed the testimony of witnesses, statement of counsel and memoranda on points of law, the Chancellor dismissed the suit holding that the annexation ordinance in question was not so unreasonable and unnecessary as to be an arbitrary and oppressive exercise of the city's legislative power. As a result of this holding, the complainants filed a motion for a new trial which was subsequently argued and denied. Thereupon, appeal was brought direct to this Court pursuant to T.C.A. § 16–408 because said suit is "in the nature of quo warranto."

The facts in this case show that the Memphis City Council properly passed an ordinance which annexed approximately 7.43 square miles of the North section of the Raleigh Utility District, said ordinance becoming effective January 1, 1973. In addition, the testimony of various witnesses as to the vital public services to be offered by the City of Memphis and the needs of the annexed area showed that: In relation to the public schools, the "city has an excellent [school] system;" and John Freeman, the Superintendent of the City of Memphis Schools, indicated that the annexation would have no effect on the stability of the schools within the subject area. As for police protection, Chief Proctor of the Shelby County Sheriff's Office testified that the subject area was a part of a ninety mile area covered by one patrol car and two policemen. Testimony showed that following annexation, the City will provide one patrol car with two policemen and an additional backup car with two additional policemen for patrolling the 7.43 square mile subject area alone. As for fire protection, the undisputed evidence shows that in terms of location of fire stations; quality and quantity of personnel; and quality of equipment, the City is better equipped to handle fire protection for this area. Moreover, as a concomitant, the Memphis Fire Department will provide ambulance service for the annexed area. And as a direct result of the foregoing, the fire insurance premiums paid by property owners in the subject area will be reduced. Further testimony showed that the area in question does not have street lighting. After annexation, however, said lighting will be provided. The testimony also showed that the City plans to put in sewers to serve the homes in this area. Presently, said homes are utilizing septic tanks, and there was

testimony that these tanks pose a potential health threat to one of the area lakes. In addition to the foregoing, there was testimony that annexation would improve sanitation service, drainage facilities, and street maintenance in the subject area. Clay Huddleston, the Chief Administrative Officer for the City of Memphis, fairly summarized the facts herein presented when he responded to the question whether the health, safety, and welfare of the residents of the subject area require annexation:

"A. Your Honor, if I can deal in specifics, without any generalities, when an area has a large number of people living fairly close together, there are certain things they need that are provided by municipalites, that other governments don't provide. For instance, a high level of police service. When it was in the county, it was being served by one car; when it came into the City, we put three more cars in the area. We simply get more calls for service. With regard to sanitation, the sanitary sewers which I mentioned earlier, we are required to maintain a higher level of standards in getting sewer service into people outside the City. When you have a high concentration of people living together, you have a higher incidence of disease and, therefore, sanitary conditions need to be higher. We are particularly concerned about some of the lake areas where you have infiltration of septic tanks. We have some real serious engineering problems and it's going to cost us a lot more money than other areas in the City.

"With regard to parks and recreation, here again, with people living in subdivisions, they are more close together than in a rural area, and we have to plan for more parks and larger parks where people have some green space to go to. This is an urban service, City service.

"With regard to fire protection, the incidence of fire and the risk of fire is significantly greater where you have high commercial concentrations, retail businesses, shopping centers, and it requires a higher level of fire protection service. That's why, for example, the Raleigh Utility District, they have only four— they have three pumpers serving the entire area, and their basic role is to serve —they are a Class Six insurance rating. Whereas, we came in with two ladders and four pumpers, and there will be four new firehouses, in order to minimize the risk of fire. Also, the fire department, as you know, runs an ambulance service, an emergency medical service, which we do need when we have higher concentrations of people living together."

Likewise, the Chancellor's memorandum opinion reflects the aforementioned facts. Therein he stated:

"[T]he area of proposed annexation which is contiguous to the City of Memphis is rapidly developing into an urban area [and the] plan of services for the area will not over-extend the police, fire and utility facilities of the City of Memphis, [and] among other things, the streets in the annexed area will be curbed and guttered; street lights installed and septic tanks eliminated.

"The Court finds further that since the annexation of Raleigh proper it is not feasible for the Raleigh Utility District to continue to furnish the services of water, sewerage and fire protection that it has been supplying to the area in question, and that as a result the City of Memphis will be responsible for funishing these services to this area whether or not the area is annexed."

With the foregoing facts and findings in mind, we must now answer three questions raised by complainants to properly resolve this case. First, procedurally, was the ordinance improperly passed? Second, does the effect of the ordinance violate the annexed area's right to equal treatment under the law? And last, did the City of Mem-

phis act arbitrarily and unreasonably in passing the annexation ordinance?

Turning to the first question, complainants contend that the annexation ordinance is invalid because of a variance between the description of the area as found in the third reading of the ordinance and its final description. However, complainants' contention is without merit because it is clear from the record that the ordinance which was passed on July 18, 1972 was amended on July 25, 1972 merely to correct a clerical error in the description of the subject property. This correction was made before the Minutes of the July 18th meeting were approved and thus the final ordinance was lawfully enacted. Nevertheless, even if the complainants' contention were correct, said contention exceeds the scope of their pleadings, therefore, are beyond the scope of review. *See, e. g.,* Stainback v. Junk Bros. Lumber & Mfg. Co., 98 Tenn. 306, 39 S.W. 530 (1896).

The second question to be resolved concerns complainants' contention that the annexation ordinance is violative of the equal protection clause in that it allegedly brings the subject area into an unconstitutional school system. In an annexation case wherein a similar constitutional question arose, the United States Supreme Court responded by stating:

"Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the state within the meaning of the Federal Constitution. The state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the Unites States. Although the inhabitants and property owners may, by such changes, suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right, by contract or otherwise, in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it." Hunter v. City of Pittsburg, 207 U. S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907).

It is clear from the foregoing and the facts of the instant case that complainants' second contention is also without merit. We so hold because it is beyond dispute that the subject area will experience no invidious discrimination as a result of annexation. Moreover, in annexation cases there is no equal protection or due process argument that can properly be made when the statute is properly followed.

The final question and the key to this case is whether the subject annexation ordinance was "reasonably enacted" in ac-

cordance with T.C.A. § 6–309. Said statute provides in pertinent part that:

"A municipality when petitioned by a majority of the residents and property owners of the affected territory, or upon its own initiative when it appears that the prosperity of such municipality and territory will be materially retarded and the safety and welfare of the inhabitants and property thereof endangered, after notice and public hearing, by ordinance, may extend its corporate limits by annexation of such territory adjoining its existing boundaries as may be deemed necessary for the welfare of the residents and property owners of the affected territory as well as the municipality as a whole, provided said ordinance shall not become operative until thirty (30) days after final passage thereof."

Complainants contend that there is a material difference between the language of the statute "that the prosperity of such municipality and territory will be materially retarded and the safety and welfare of the inhabitants and prosperity thereof endangered," if the area is not annexed and the term, "may be deemed necessary for the welfare of the residents and property owners of the affected territory as well as the municipality as a whole." However, we do not agree with this proposition because the first portion of the statute has reference to the effect upon the municipality and the annexed territory in the event no action is taken. In other words, the Act is saying that the legislative body should consider what adverse conditions would result from a failure to act, and to consider what benefits would follow affirmative action. It follows as a matter of logic that if by affirmative action the "safety and welfare" of the community would be benefited, then by failure to act "the safety and welfare" would be endangered. Thus, it appears to this Court that the legislative body is required by the statute to consider the effects of both positive and negative action, and to then act or fail to act as in its discretion is best for the community. In the instant case, the City of Memphis chose to take the affirmative action of annexation and having made that legislative decision, what now can the judiciary do?

This question was answered in State ex rel. v. City of Columbia, 208 Tenn. 59, 343 S.W.2d 888 (1961), wherein this Court said:

"In the outset it might not be amiss to say that annexation by city ordinance under this statute contains no trick or gimmick. It is just the Legislature conferring the right upon the city fathers to annex under the conditions prescribed in the statute. This right of annexation, aside from the statute, would be in the Legislature, and the Legislature having the right to annex has likewise the right to confer this power upon the city fathers, and it seems to us perfectly obvious that the city fathers would know far more about the needs and necessity of annexation than would the Legislature. The reasons therefor are so obvious that it isn't necessary for us to express them. This being true, such an annexation, so long as it complies with the statute, has the same force and effect and is subject to the same attacks only as annexation would be if done by the Legislature."

██ It is obvious that in the annexation of territory, someone must fix the boundaries, and whether said boundaries are fixed pursuant to the annexation statute contained in T.C.A. § 6–309 or directly by the legislature, it remains a legislative matter and will not be disturbed by this Court unless the action was arbitrary and unreasonable. On the question of reasonableness, we realize that in every annexation case there are both advantages and disadvantages to annexation. Nevertheless, if a debatable question exists as to whether the advantages outweigh the disadvantages, then the court must rule in favor of the annexation. Stated another way, if the reasonableness of the annexation is a de-

batable question, then the court will uphold the validity of the annexation.

 Applying the foregoing test to the facts in the instant case, it is evident that a debatable question exists. Thus, we find complainants' third contention meritless. Having so found, it necessarily follows that the Chancellor's decree is affirmed.

DYER, C. J., and CHATTIN, Mc-CANLESS, and FONES, JJ., concur.