IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 14, 2005 Session

## STATE OF TENNESSEE, ex rel., DARRELL L. TIPTON, MICHAEL L. ROSS, and DALE M. ROSS v. CITY OF KNOXVILLE

**Direct Appeal from the Chancery Court for Knox County**
**No.  152487-2      Hon.  Daryl R. Fansler, Chancellor**

### No. E2004-01359-COA-R3-CV  - FILED JANUARY 17, 2006

In this *quo warranto* action contesting annexation by the City, the Trial Could held landowners were not entitled to a jury trial and they had the burden of proof to contest in the annexation.  Following trial, the Court held landowners had carried the burden of proof to invalidate the annexation.  On appeal, we affirm the Trial Court's preliminary rulings, but reverse the invalidation of the annexation.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and NORMA MCGEE OGLE, J., joined.

Debra C. Poplin, Knoxville, Tennessee, for appellant, City of Knoxville.

David L. Buuck, Knoxville, Tennessee, for appellees.

### OPINION

In this *quo warranto* action, the Chancellor voided defendant's ordinance annexing plaintiffs' real estate, and the City has appealed.

The Complaint attacked the constitutionality of the annexation statutes and the Attorney General was allowed to intervene to defend.  Before trial, the Chancellor granted a partial summary judgment, upholding the constitutionality of the annexation statutes, and a bench trial was

held during several days in September 2003. Subsequently, the Trial Court entered an Memorandum Opinion which concluded that plaintiffs could choose one of two burdens of proof under Tenn. Code Ann. § 6-58-111, i.e., the plaintiffs could either prove that the Ordinance was unreasonable, or they could prove that material retardation would not occur in the absence of such annexation. Then the Trial Court entered an Order holding that "the Plaintiffs have carried their burden of proof as required under T.C.A. § 6-58-111(a) in establishing that the health, safety, and welfare of the citizens and property owners of the municipality and 'territory' will not be materially retarded in the absence of such annexation." The Court voided the Ordinance, and the City noticed an Appeal.

Our standard of review is well described in *Keaton v. Hancock County Bd. of Educ.,* 119 S.W.3d 218, 222-23 (Tenn. Ct. App. 2003), as follows:

> This is a non-jury case and, as such, is subject to our *de novo* review upon the record of the proceedings below. As mandated by Tenn. R. App. P. 13(d), there is a presumption that the trial court's findings of fact are correct and we must honor that presumption unless the evidence preponderates to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993). There is no presumption as to the correctness of the trial court's conclusions of law. *See Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996).

The City argues that the Trial Court erred in its interpretation of T.C.A. § 6-58-111(a) as to the applicable burden of proof to be carried by the plaintiff. This issue turns on the interpretation and coordination of the two statutes: Tenn. Code Ann. § 6-51-103 and Tenn. Code Ann. § 6-58-111. Section 6-51-103 is part of the older statutory framework enacted in 1955. 1955 Tenn. Pub. Acts, ch. 113, § 2. The older framework authorizes municipalities to expand their corporate boundaries either (1) in response to a petition from a majority of the residents and property owners of the affected territory or (2) upon its own initiative if failure to expand would materially retard the prosperity of the municipality and territory and would endanger the safety and welfare of the inhabitants and property in the municipality and territory. Tenn. Code Ann. § 6-51-102(a)(1) (2005). Section 6-51-103 allows an aggrieved owner of property lying within the annexed territory[1] to file suit in the nature of a *quo warranto* proceeding to contest the validity of the annexation ordinance. § 6-51-103(a)(1)(A); *Hart v. City of Johnson City*, 801 S.W.2d 512 (Tenn. 1990). When an aggrieved property owner files suit, the city proposing the annexation has the burden of proving "that [the] annexation ordinance is reasonable for the overall well-being of the communities involved." § 6-51-103(c). The Supreme Court has interpreted § 6-51-103 to the effect that the General Assembly intended the issue of reasonableness to be tried by a jury unless some disqualifying condition applied. *State ex rel. Moretz v. City of Johnson City*, 581 S.W.2d 628, 631 (Tenn. 1979).

---

[1]Although § 6-51-103(a)(1)(A) states that an aggrieved owner of property bordering or lying within the annexed territory has standing to contest the annexation ordinance, the Tennessee Supreme Court held that only owners of property lying within the territory have such standing. *Hart v. City of Johnson City*, 801 S.W.2d 512 (Tenn. 1990).

Section 6-58-111 is part of the newer statutory framework enacted in 1998. 1998 Tenn. Pub. Acts, ch. 1101, § 12. This enactment is entitled the "Comprehensive Growth Plan," and was enacted to establish a comprehensive growth policy for the state that

(1) Eliminates annexation or incorporation out of fear;

(2) Establishes incentives to annex or incorporate where appropriate;

(3) More closely matches the timing of development and the provision of public services;

(4) Stabilizes each county's education funding base and establishes an incentive for each county legislative body to be more interested in education matters;  and

(5) Minimizes urban sprawl.

Tenn. Code Ann. § 6-58-102 (2005).

This new statutory scheme requires the local governments in each county to develop a county growth plan through a coordinating committee. Tenn. Code Ann. § 6-58-104 (2005). The plan would allocate the county's unincorporated land to urban growth areas,[2] planned growth areas,[3] and rural areas.[4]

Once a county and its municipalities adopt a growth plan and it is approved by the local government planning advisory committee, all land use decisions in the county must conform to the growth plan. Tenn. Code Ann. § 6-58-107. Municipal governments in such counties are still permitted to annex territory upon their own initiative pursuant to § 6-51-102(a)(1), but they may only do so within their urban growth boundary.  § 6-58-111(a).  Where a municipality annexes territory within its urban growth boundary and a *quo warranto* action is filed to challenge the annexation,

_____

[2]An urban growth area includes territory contiguous to the existing boundaries of a municipality into which the municipality is expected to grow during the next twenty years and to which the municipality is better able to provide services than are other municipalities. Tenn. Code Ann. § 6-58-106(a)(1) (2005).

[3]A county's planned growth area consists of territory in which residential and nonresidential growth is expected to occur over the next twenty years and which is not part of any municipality or urban growth area. Tenn. Code Ann. § 6-58-106(b)(1) (2005).

[4]A county's rural area consists of territory which is not in any urban growth or planned growth area and which is to be preserved for uses such as agriculture, forestry, recreation, or wildlife management. Tenn. Code Ann. § 6-58-106(c)(1) (2005).

the party filing the action has the burden of proving that:

> (1) An annexation ordinance is unreasonable for the overall well-being of the communities involved; or

> (2) The health, safety, and welfare of the citizens and property owners of the municipality and territory will not be materially retarded in the absence of such annexation.

§ 6-58-111(a). Such an action is tried by a circuit judge or chancellor without a jury. § 6-58-111(b).

Thus, the judicial review procedures outlined in the older framework (§ 6-51-103) and the newer framework (§ 6-58-111) have significant differences. First, under § 6-58-111(a), the newer framework shifts the burden of proof from the annexing municipality to the party contesting the annexation. Second, under § 6-58-111(b), the newer framework removes any right to a jury trial. An issue presented in this case is whether there is another significant difference, i.e., whether the burden of proof was not only shifted, but whether both grounds set forth in the statute must be proven.

The crux of this issue is the meaning of the word "or" as it is used in § 6-58-111(a)(1)-(2). The City argues that construing "or" in its disjunctive sense would cause § 6-58-111 to provide for two alternate burdens of proof, (1) unreasonableness or (2) no material retardation, while § 6-51-103 only provides one burden of proof, reasonableness. The City also argues that this would make the two statutes irreconcilable, and that "or" should be construed as the conjunction "and." Plaintiffs argue that this issue is not appropriate for review because it was not properly raised before the trial court, and they argue that "or" should be construed in its disjunctive sense.

At the beginning of the trial, the Plaintiffs made clear that they did not intend to prove that the Ordinance was unreasonable; rather, they intended to prove that the health, welfare, and safety of both the City and the annexed territory would not be materially retarded if the territory was not annexed. During the bench trial the Plaintiffs focused on this issue, and the City focused on whether the Ordinance was reasonable. Due to this apparent disconnect between the evidence presented by the parties, the Trial Judge gave the parties two weeks in which to submit briefs discussing the correct burden of proof set forth in Tenn. Code Ann. § 6-58-111. Subsequently, the Chancellor, in his Memorandum Opinion, concluded that the Plaintiffs could choose one of the two burdens of proof, and could either prove that the Ordinance was unreasonable or they could prove that material retardation would not occur in the absence of annexation.

Plaintiffs argue this issue should not be reviewed on appeal because it did not arise until after the trial. "In the non-jury case, until the matter has been finally submitted to the trial judge for decision, the 'trial' of the case has not been concluded. The trial judge may order further proof to be taken, may reopen the proof for various purposes, extend the time for filing briefs, and the like." *Weedman v. Searcy*, 781 S.W.2d 855, 857 (Tenn. 1989).

-4-

Based on the foregoing, the "trial" of this case did not end until the Trial Judge's two week deadline for post-trial briefs had passed. Thus, the issue was properly raised before the Trial Court.

While the City argues the Chancellor erred in construing "or" in its disjunctive sense, the Supreme Court has instructed:

> Legislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language.

*Carson Creek Vacation Resorts, Inc. v. State, Dept. of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993). The City argues the meaning of the word "or" in § 6-58-111(a)(1)-(2) is ambiguous, and that the word "or" in its disjunctive sense will render T.C.A. §§ 6-58-111 and 6-51-103 irreconcilable.[5] The City's argument is based on the incorrect view that the issue of reasonableness required by § 6-51-103(a), (c), (d) applies to all annexation contests, including contests of annexations within an approved urban growth boundary.

Section 6-58-111 applies to *quo warranto* proceedings contesting an annexation of territory by a municipality within its approved urban growth boundary. § 6-58-111(a). When the General Assembly enacted § 6-58-111 it created incentives to encourage local governments to develop approved growth plans. §§ 6-58-109 to -110. Thus, the General Assembly intended for all counties to eventually develop growth plans with the result that § 6-58-111 would eventually apply to all annexation proceedings. Since the provisions allowed for a period of time for approving growth plans, it followed that some counties would not. Thus, § 6-51-103(a), (c), (d) was retained to govern annexation contests in counties without approved growth plans.

A disjunctive construction of the word "or" in § 6-58-111(a)(1)-(2) does not render §§ 6-58-111 and 6-51-103 irreconcilable because the burdens of proof established in these statutes are not applied simultaneously. Section 6-58-111(a) applies to annexations of territory within a municipality's approved urban growth boundary and § 6-51-103(a), (c), (d) applies to annexations that occur in counties without an approved growth plan. These sections are reconciled because they apply to different situations, and are not ambiguous.

Finally, on this issue, the City argues the legislative history of § 6-58-111(a)(1)-(2) demonstrates that the use of the word "or" is a typographical error. However, there is no need to resort to the statute's legislative history, because the natural and ordinary meaning of the statute is not ambiguous. Moreover, if the use of legislative history was appropriate here, the legislative

---

[5]The City argues that construing "or" in its disjunctive sense would cause § 6-58-111(a) to provide for two alternate burdens of proof, (1) unreasonableness or (2) no material retardation, while § 6-51-103(a), (c), (d) only provide one burden of proof, reasonableness. According to the City, this makes the two statutes irreconcilable.

history does not show that the use of the word "or" was a typographical error.

The parties have stipulated that the land to be annexed is within the City's approved urban growth boundary. Therefore, § 6-58-111(a)(1)-(2) applies, and Plaintiffs need only prove that either (1) the Ordinance is unreasonable or (2) that "the health, safety, and welfare of the citizens and property owners of the municipality and territory will not be materially retarded in the absence of such annexation." The Plaintiffs chose the latter as their preferred burden of proof.

In this regard, the Trial Court held that "by a preponderance of the evidence the plaintiffs have proven that the health, safety, and welfare of the citizens and property owners of the municipality and the 'territory' will not be materially retarded in the absence of such annexation."

In this case, the burden of proof on this issue was upon plaintiffs. Language similar to that in § 6-58-111(a)(2) can be found in § 6-51-102(a)(1), which states that a municipality may annex unincorporated territory upon its own initiative "when it appears that the prosperity of such municipality and territory will be materially retarded and the safety and welfare of the inhabitants and property endangered." § 6-51-102(a)(1) (2005). The General Assembly's decision to borrow language from § 6-51-102(a)(1) and use it in § 6-58-111(a)(2)'s burden of proof must have furthered some purpose. *Tidwell v. Servomation-Willoughby Co.,* 483 S.W.2d 98, 100 (Tenn. 1972).

The Tennessee Supreme Court has described the pre-annexation deliberations required of municipal legislative bodies by § 6-51-102(a)(1) as follows:

> [T]he Act is saying that the legislative body should consider what adverse conditions would result from a failure to act, and to consider what benefits would follow affirmative action. It follows as a matter of logic that if by affirmative action the "safety and welfare" of the community would be benefitted, then by failure to act "the safety and welfare" would be endangered. Thus, it appears to this Court that the legislative body is required by the statute to consider the effects of both positive and negative action, and to then act or fail to act as in its discretion is best for the community.

*State ex rel. Wood v. City of Memphis*, 510 S.W.2d 889, 893 (Tenn. 1974). In other words, if annexation would benefit a municipality and territory, failure to annex the territory would necessarily harm that municipality and territory. *See, e.g., Mulrooney v. Town of Collierville*, No. W1999-01474-COA-R3-CV, 2000 WL 34411151, at *3 (Tenn. Ct. App. 2000). Interpreting § 6-58-111(a)(2) in conjunction with § 6-51-102(a)(1) leads to the conclusion that proving lack of material retardation necessarily requires proof that annexation will not materially benefit the municipality and territory. Therefore, under § 6-58-111(a)(2), Plaintiffs were required to prove that annexation would not materially benefit the health, safety, and welfare of the citizens and property owners of the City and the affected territory.

Whether annexation is materially beneficial to the affected territory depends not only

upon what services the municipality will provide after annexation, but also upon those services the municipality already provides to the affected territory. The fact that an affected territory already receives municipal services demonstrates that the affected territory benefits from those services and that the welfare of the property owners in the affected territory is enhanced by those services. *Bowevil Express, LLC v. City of Henderson*, No. W1999-02137-COA-R3-CV, 2001 WL 204211, at *5 (Tenn. Ct. App. 2001); *see also Cox v. City of Jackson*, No. 02A01-9701-CH-00002, 1997 WL 777078, at *6 (Tenn. Ct. App. 1997).

The territory affected by the Ordinance (the "Territory") is a single parcel of land owned by plaintiffs and entirely surrounded by the City. The Territory is located at 8426 Kingston Pike, and according to the City's Director of Engineering, Kingston Pike's average daily traffic volume is between 32,000 and 33,000 cars per day. The current lessee of the Territory testified that the traffic volume on Kingston Pike is "an asset to that location."

Kingston Pike is a state highway, and the Tennessee Department of Transportation and the City work together to maintain the portion of Kingston Pike within the City. Under the contract governing this relationship, the State reimburses the City for maintenance of the road surface, but does not provide the City with funds for storm drainage, traffic control signs and signals, street lighting, and street name signs. The Territory is located along the south side of Kingston Pike between the intersections of Kingston Pike with Gallaher View Road and Walker Springs Road. Along this portion of Kingston Pike there are about twenty street lights, one of which is directly in front of the Territory. There are also three traffic signals along this portion of Kingston Pike, one near the middle of the block and one on either end. According to the City's Mayor, the City pays for the installation and maintenance of those street lights and signals as well as for the necessary electricity. Plaintiff Michael Ross admitted that the street lights are "a good thing", and that the traffic signals are helpful for customers trying to enter the Territory from Kingston Pike. The current lessee of the Territory testified that lighting like that provided by the street lights helps to deter crime and that "to some degree" the traffic signals provide breaks in traffic which help customers entering and exiting the Territory.

Additionally, the Territory is surrounded by City storm drains, and according to the City's Director of Engineering, all rain water falling on the Territory flows into the City's storm drain system. The City bears the cost of the installation, inspection, and maintenance of these storm drains.

As the City completely surrounds the Territory, the City's police patrol the area surrounding the Territory. The City's Police Department describes the three square miles surrounding the Territory as a "primary beat." There is at least one officer on patrol in this area at all times. According to the City's Deputy Chief of Police, the "high visibility patrols" conducted in this area deter crime. Although the Territory is not part of the City and City police have no jurisdiction there, 911 dispatchers have dispatched City police to the Territory on 51 separate occasions between 1999 and 2003.

Plaintiffs contracted with Rural Metro Fire Department to provide firefighting services to the Territory, but the fire hydrants near the Territory are owned by the Knoxville Utilities Board and were installed at the expense of the City's fire department. The water that flows through these fire hydrants is paid for by the City. Fire organizations other than the City's fire department may use these hydrants, but they do not reimburse the City for the cost of water. According to the City's Fire Chief, the plaintiffs' building within the Territory is only ten feet away from the nearest building within the city, and regardless of Rural Metro's response, the City's fire department responds to any fire in the Territory in order to prevent damage to nearby buildings within the City.

The City's proposed Plan of Services for the Territory states that on the date of annexation all of the City's police resources will be available to the Territory, and the City's police department will respond to all calls for service from the territory. The City's police department has approximately 406 certified law enforcement officers, including 245 patrol officers. In contrast, the Knox County Sheriff's Department has approximately 440 certified law enforcement officers, including 200 patrol officers, whose primary response area is outside of the City, and away from the Territory. The unincorporated area of responsibility consists of 420 square miles, vis a vis, the City's responsibility of approximately 100 square miles. Thus, annexation is likely to lead to a more rapid response to the Territory's law enforcement needs.

The City's Plan of Services also states that on the date of annexation the City's fire department will answer all calls for service from the Territory. According the City's Fire Chief, the department has 50 pieces of fire suppression equipment, has 328 full time firefighters, and at any given time there are approximately 97 on duty. Those who are not on duty are considered on call in cases of significant emergency. These resources are stationed at eighteen fire stations throughout the City, and the firefighters have an average response time of four minutes to any location within the City. According to the City's Fire Chief, the average response time to the Territory would be approximately three and a half minutes.

In contrast Rural Metro Fire Department has 31 pieces of fire suppression equipment and 28 full time firefighters located at 14 stations in the unincorporated portions of the county. The department also has 128 reservists who are part-time employees of the department. These reservists are notified of a call for service via pager. Based upon these facts and the fact that the Territory is an unincorporated enclave surrounded by the City, annexation would lead to a more rapid response to the Territory's firefighting needs.

Based upon all of the foregoing, we conclude that the preponderance of the evidence establishes the territory would materially benefit from annexation. This conclusion flows from the improved services that the Territory will receive after annexation and from the material benefits the Territory already receives from the City. Due to the Territory's unique geographic position, it is already a *de facto* part of the City.

The issue thus becomes whether the proposed annexation would materially benefit the City.

The County designates the Territory as a "CA" general business zone. The City has zoned the parcels surrounding the Territory as "C4" (highway and arterial commercial district), "C3" (general commercial district), or "PC-1" (retail and office park district). Land uses permitted within the County's "CA" zone which are not permitted in the above City zones include: single family and two family residences, armories, undertaking establishments, canneries, farming, transient mobile home parks, portable sawmills, retail poultry businesses, demolition landfills, and commercial telecommunications towers. "[A city] has a vital concern in guarding against the helter-skelter establishment of commercial activities that may not be in harmony with those already in operation. Indeed, the prevention of incompatible commercial enterprises is a high municipal duty." *State ex rel, Collier v. City of Pigeon Forge*, 599 S.W.2d 545, 547 (Tenn. 1980). After annexation, the City will be able to place an appropriate land use zone upon the Territory (subject to grandfathering). This will benefit the surrounding City property owners by guaranteeing land use consistency throughout the area.

The fact that the Territory is an unincorporated enclave surrounded by the City complicates the provision of emergency services in the City. The City's Mayor described the problem as follows:

> [F]rom a service delivery standpoint [the Territory's location] creates a certain degree of confusion and uncertainty which frankly places at risk persons who might be doing business [in the Territory,] [a]nd it just seems to me from a safety standpoint it made a lot of sense to recommend [the Territory] come into the city.

The Division Chief of the Rural-Metro Fire Department admitted that if the call for service does not originate from the Territory there could be confusion as to the proper agency to dispatch. According to the 911 dispatch center's records specialist, dispatch errors would be reduced if the Territory were made part of the City. Surrounding property owners would benefit from improved dispatch of emergency services to the Territory. This is especially true of firefighting services, given the close proximity of the Territory to surrounding buildings in the City.

After annexation, the City would be able to guarantee harmonious land uses throughout the area surrounding the Territory. In addition, the City will be able to better respond to emergencies in that area. Based on these facts, the preponderance of the evidence establishes that the City would materially benefit from the annexation.

Based upon the evidence heretofore analyzed, the preponderance of the evidence shows that (1) the Territory currently, materially benefits from services provided by the City, (2) the Territory would materially benefit from the additional post-annexation services which the City would provide, and (3) the City will materially benefit from annexation. If the Territory and City will materially benefit from annexation, then it follows that the failure to annex the Territory would materially retard the health, safety, and welfare of the citizens and property owners of the City and Territory. *See State ex rel. Wood v. City of Memphis*, 510 S.W.2d 889, 893 (Tenn. 1974); *Mulrooney v. Town of Collierville*, No. W1999-01474-COA-R3-CV, 2000 WL 34411151, at *3 (Tenn. Ct. App.

2000). We conclude the Plaintiffs failed to carry their burden of proof under Tenn. Code Ann. § 6-58-111(a)(2), and the evidence preponderates against the Trial Court's finding of fact. Tenn. R. App. P. 13(d).

Conditioned upon our ruling, the plaintiffs raised the issue on appeal that T.C.A. §6-58-111 is unconstitutional in depriving plaintiffs of the right to a jury trial.

Plaintiffs base this claim on five arguments: (1) The statute is a unconstitutional classification violating Article XI, Section 9 of the Tennessee Constitution, (2) the caption of 1998 Tenn. Pub. Acts, ch. 1101 does not meet the requirements of Article II, Section 17 of the Tennessee Constitution, (3) the right to a jury trial in *quo warranto* actions is guaranteed by Article I, Section 6 of the Tennessee Constitution, (4) the Tennessee Supreme Court has held that owners of property annexed into a municipality by ordinance have a constitutional right to a jury trial when contesting that annexation, and (5) the right to a jury trial is guaranteed by Rule 38.01 of the Tennessee Rules of Civil Procedure.

Plaintiffs argue that § 6-58-111(b) creates an unconstitutional classification because it applies only to annexations of territory within a municipality's approved urban growth plan. They further argue that local governments are not required to adopt approved growth plans, and they conclude that "it is possible" that there are counties which do not have such approved growth plans. They argue that based upon this "possibility," and in those counties without such plans, challengers to annexation would have access to a jury trial under § 6-51-103.

Article XI, Section 9 of the Tennessee Constitution states in relevant part: "The General Assembly shall by general law provide the exclusive methods by which municipalities may be created, merged, consolidated and dissolved and by which municipal boundaries may be altered." Tenn. Const. Art. XI, § 9 (the "Municipal Boundaries Clause"). According to the Tennessee Supreme Court, the Municipal Boundaries Clause was adopted to prevent "the great evils that had arisen in regard to the Legislature enacting legislation affecting only one county or municipality." *Frost v. City of Chattanooga*, 488 S.W.2d 370, 373 (Tenn. 1972). The Court has invalidated amendments to municipal annexation statutes when such amendments apply in only one or relatively few counties. *See Hart v. City of Johnson City*, 801 S.W.2d 512 (Tenn. 1990) (invalidating an amendment to the *quo warranto* statute which only applied in 14 counties); *Vollmer v. City of Memphis*, 730 S.W.2d 619 (Tenn. 1987) (invalidating an amendment which used narrow population brackets to define the scope of its application); *Pirtle v. City of Jackson*, 560 S.W.2d 400, 402 (Tenn. 1977) (invalidating an amendment to the quo warranto proceeding's burden of proof which applied in only a "few chosen municipalities"); *Frost,* 488 S.W.2d at 371 (invalidating an amendment which applied only to the City of Chattanooga).

Unlike the statues invalidated in these cases, § 6-58-111(b) was not enacted as a special rule for a few chosen local governments. Rather, it was enacted with the intention that it would apply to most and eventually all annexations. This intention is evidenced by the General Assembly's creation of a coordinating committee within every county. Tenn. Code Ann. § 6-58-

104(a)(1)-(2) (2005). The statutory scheme demonstrates the General Assembly enacted Chapter 58, intending that every county would have a growth plan and thus every municipality would have an approved growth boundary. Because § 6-58-111(b) is not an attempt to create a rule that applies only to one or a few chosen local governments, it does not rise to the evil which Article XI, Section 9 was intended to remedy. We conclude this section does not violate the Municipal Boundaries Clause.

Next, plaintiffs argue the caption of 1998 Tenn. Pub. Acts, ch. 1101 does not meet the requirements of Article II, § 17 of the Tennessee Constitution. The Section of the Act states, "AN ACT to amend Tennessee Code Annotated, Title 4; Title 5; Title 6; Title 7; Title 13, Title 49; Title 67; and Title 68, relative to growth." Section 12 of Chapter 1101, codified at Tenn. Code Ann. § 6-58-111, states that when a *quo warranto* action is filed to challenge an annexation within a municipality's approved urban growth boundary, that action is tried without a jury. Thus, the plaintiffs' argue that this caption does not satisfy the requirements of Article II, § 17 because the caption does not specifically mention the effect which 1998 Tenn. Pub. Acts, ch. 1101, § 12 has on annexations, *quo warranto* proceedings, and jury trials. Article II, § 17 of the Tennessee Constitution states,

> Bills may originate in either House; but may be amended, altered or rejected by the other. No bill shall become a law which embraces more than one subject, that subject to be expressed in the title. All acts which repeal, revive or amend former laws, shall recite in their caption, or otherwise, the title or substance of the law repealed, revived or amended.

The Supreme Court has held that this provision is "to be liberally construed, so that the General Assembly [will] not be 'unnecessarily embarrassed in the exercise of its legislative powers and functions.'" *Tennessee Mun. League v. Thompson*, 958 S.W.2d 333, 336 (Tenn. 1997) (quoting *Memphis St. Ry. Co. v. Byrne*, 104 S.W. 460, 461 (1907)). When a caption is analyzed under this Article, the courts "will presume that the caption adequately expresses the subject of the body of an act and avoid a technical or narrow construction of the caption." *Chattanooga-Hamilton County Hosp. Auth. v. City of Chattanooga*, 580 S.W.2d 322, 326 (Tenn. 1979). The principal question in this analysis is whether the "[s]ubject matter of the act is germane to that expressed in the [caption]." *Id.* (quoting *S. Photo & Blue Print Co. v. Gore*, 114 S.W.2d 796, 798 (1938)).

The overall subject of the challenged act is the amendment of eight specified Titles of the Tennessee Code Annotated. *See Tennessee Mun. League*, 958 S.W.2d at 337-338 (describing a caption's similar list of Titles to be amended as the overall subject of that act). The overall subject, however, is limited by the phrase "relative to growth." *Id.* (stating that "relative to" has a restrictive or narrowing effect). Accordingly, any provisions which are germane to "growth" and which amend one or more of the specified Titles are a proper part of the act.

The challenged act amended Title 6 of the Tennessee Code Annotated by creating Chapter 58, and § 12 is part of this new Chapter. 1998 Tenn. Pub. Acts, ch. 1101, § 2. Section 12 is germane to the overall subject of the challenged act because it is part of the amendment to Title

-11-

6. In addition, § 12 governs both annexations by municipalities with approved urban growth boundaries and *quo warranto* challenges to such annexations. Annexations and *quo warranto* proceedings challenging such annexations both affect the growth of municipalities, and both are germane to the "growth" of municipalities. Although the act's caption does not specifically mention § 12's effect on annexations, *quo warranto* proceedings, or jury trials, Article II, § 17 does not require that a caption express the means or instrumentalities used to accomplish the purpose of an act. *Chattanooga-Hamilton County Hosp. Auth.*, 580 S.W.2d at 326. Since § 12 is germane to the act's expressed subject, it is a proper part of the challenged act and does not violate Article II, § 17.

Plaintiffs also argue that Article I, § 6 of the Tennessee Constitution guarantees a right to a jury trial in a *quo warranto* proceeding. Article I, § 6 states, "That the right of trial by jury shall remain inviolate, and no religious or political test shall ever be required as a qualification for jurors." Tenn. Const. art. I, § 6. The Tennessee Supreme Court has described the scope of this guarantee as follows:

> Article I, section 6 of our Constitution does not guarantee the right to a jury trial in every case. . . . This right has been interpreted to be a trial by jury as it existed at common law, or more specifically, "the common law under the laws and constitution of North Carolina at the time of the adoption of the Tennessee Constitution of 1796." For rights and remedies created after the formation of our Constitution, the legislature is free to enact procedures that do not include jury trials.

*Helms v. Tennessee Dept. of Safety*, 987 S.W.2d 545, 547 (Tenn. 1999) (quoting *Patten v. State*, 426 S.W.2d 503, 506 (Tenn.1968)). In 1827 the Tennessee Supreme Court described the *quo warranto* proceeding as follows:

> The old writ of *quo warranto* had fallen into disuse in England, prior to the passage of the North Carolina Act of 1715, ch. 31, sec. 6, adopting the English common law. Neither that writ, nor an information in the nature of it, is known by us to have ever been used in the colony of North Carolina, and was not, therefore, incorporated into our code by the Act of 1778, ch. 5, sec. 2, which did not adopt such parts of the common law as had not been in force and in use in the colony, or were inconsistent with the new form of government, or which had been abrogated, repealed, expired, or become obsolete.

*State v. Turk*, 8 Tenn. 287, 1827 WL 667 at \*4 (1827). *Quo warranto* actions did not exist in this State until "the Legislature of 1845-1846 passed the first statute on this subject." *City of Fairview v. Spears*, 359 S.W.2d 824, 825 (Tenn. 1962). Because the *quo warranto* action is a remedy "created after the formation of our Constitution," Article I, § 6 of the Tennessee Constitution does not guarantee a jury trial in such a proceeding. *Helms*, 987 S.W.2d at 547.

Next, plaintiffs argue that under the Tennessee Supreme Court's holding in *State ex. rel. Moretz v. City of Johnson City*, 581 S.W.2d 628 (Tenn. 1979) they have a constitutional right

to a jury trial. In *Moretz*, the Tennessee Supreme Court interpreted Tenn. Code Ann. § 6-51-103(d) and held that the General Assembly intended that the issue of an annexation's reasonableness would be tried by a jury unless some disqualifying condition applied. The *Moretz* Court did not find a constitutional right to a jury trial when contesting an annexation. Rather, it simply interpreted the legislative intent behind § 6-51-103(d), a statute which does not apply to the facts of this case. This case involves the annexation of territory within a municipality's approved urban growth boundary; therefore, § 6-58-111 applies to this case, not § 6-51-103.

Finally, plaintiffs argue that Rule 38.01 of the Tennessee Rules of Civil Procedure entitles them to a jury trial. Rule 38.01 states, "The right of trial by jury as declared by the Constitution or existing laws of the State of Tennessee shall be preserved to the parties inviolate." This rule does not guarantee a right to jury trial in all cases. Instead, the rule only guarantees the right to a jury to the extent that this right is granted by the Constitution or the existing laws of the State. As we have discussed, the Tennessee Constitution does not guarantee the right to a jury trial in *quo warranto* proceedings. Moreover, the existing law which applies to the facts of this case, § 6-58-111(b), specifically denies the right to a jury trial.

We hold that the evidence preponderates against the Trial Court's conclusion that plaintiffs carried their burden of proof under the statute, because the preponderance of the evidence demonstrates that the absence of annexation will cause material retardation of the health, safety, and welfare of the citizens of the City and the property owners and occupants of the Territory. We reverse the Trial Court on this issue, and affirm the Trial Judge's decision that there is no constitutionally protected right to a jury trial in a *quo warranto* proceeding.

The costs of the appeal are assessed to Darrell L. Tipton, Michael L. Ross, and Dale M. Ross, jointly.

---

HERSCHEL PICKENS FRANKS, P.J.