IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 15, 2010 Session

**SOUTHWEST TENNESSEE ELECTRIC MEMBERSHIP CORPORATION,
ET AL.**
**v.**
**CITY OF JACKSON, TENNESSEE and THE CITY OF JACKSON,
TENNESSEE CITY COUNCIL**

Appeal from the Chancery Court for Madison County
No. 64244     James F. Butler, Chancellor

No. W2009-00913-COA-R3-CV - Filed September 7, 2010

This is an annexation case. The defendant city decided to annex twelve square miles of land to its northwest. The territory to be annexed was divided into forty-nine subareas. Some of the subareas immediately adjoin the city's existing boundary; all are contiguous to one another. The city prepared a plan to provide services for each of the subareas. The plans of service stated that, upon annexation, the city would deliver services immediately with existing resources. The city simultaneously enacted forty-nine ordinances annexing each of the subareas. Afterward, the plaintiff residents filed the instant *quo warranto* lawsuit challenging the annexation, arguing *inter alia* that the city could not annex land that did not adjoin its existing boundary and that the plans of service were fatally deficient under the annexation statutes. After a trial, the lower court concluded that the city could annex all of the subareas and had complied with the statutory requirements for annexation. The residents appeal. We reverse the trial court's decision that the city could annex the subareas that did not immediately adjoin the city's existing boundary, affirm the decision that the city complied with the statutory requirements for annexation with respect to the remaining subareas, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in
Part, Reversed in Part and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Richard L. Winchester, Jr., Memphis, Tennessee, for the appellants, Southwest Tennessee Electric Membership Corporation, et al.

Lewis L. Cobb and Teresa A. Luna, Jackson, Tennessee, for the appellees, City of Jackson, Tennessee and The City of Jackson, Tennessee City Council

## OPINION

### FACTS AND PROCEEDINGS BELOW

This appeal is the latest installment in the ongoing expansion of Defendant/Appellee the City of Jackson, Tennessee ("City").[1]  Over the years, the City's northwestern boundary became irregularly shaped due to the incremental annexation of various parcels of land at the request of real estate developers.  Meanwhile, the area immediately outside of the City, along that irregular boundary, developed to an urban density.  As early as 1989, the City's Planning Department began studying the area to determine the suitability of annexing the land to address the jigsaw boundary and to bring the development within the City.

At some point, the Director of the City Planning Department, Stan Pilant ("Director Pilant"), concluded that an area of roughly twelve square miles of land to the northwest of the City ("Northwest territory" or "the territory") was suitable for annexation.  The territory included land in various stages of development, from undeveloped to urban density.  To make the annexation process more manageable, the Planning Department divided the Northwest territory into forty-nine subareas.  Some, but not all, of the subareas immediately adjoin the City's boundary.[2]  All of the subareas are contiguous to one another.

Director Pilant discussed the potential annexation of this land with the City's mayor, Charles Farmer.  Once Mayor Farmer concurred in the Director Pilant's recommendation to pursue annexation, the Planning Department prepared a report analyzing the financial feasability of annexation.  In preparing the analysis for the Planning Department's report, Director Pilant contacted various City departments to obtain the estimated cost of delivering services to the

---

[1]The City of Jackson was founded in 1822.  At its inception, the City was comprised of about four square blocks.  After the Civil War, the City's boundaries were expanded in 1871 and thereafter remained unchanged for the next sixty years.  In the 1930s, the City expanded in all directions.  From the 1950s through the 1990s, the City expanded by annexation every decade, due to industrial and residential growth in the suburban areas.  Many of these annexations resulted in litigation, including appeals to this Court and to our Supreme Court.  *See, e.g., Saylors v. City of Jackson*, 575 S.W.2d 264 (Tenn. 1978); *Pirtle v. City of Jackson*, 560 S.W.2d 400 (Tenn. 1970); *Cox v. City of Jackson*, No. 02A01-9701-CH-00002, 1997 WL 777078 (Tenn. Ct. App. Dec. 18, 1997), *perm. app. denied* June 22, 1998.

[2]This Opinion will refer to the subareas that do not immediately adjoin the City's boundary as "the non-adjoining subareas" and will refer to the subareas that immediately adjoin the City's existing boundary as the "adjoining subareas."

Northwest Territory; these included the City Police Department, Fire Department, Engineering Department, and Recreation and Parks Department, as well as the Jackson Energy Authority. Along with the report, the Planning Department prepared a plan of service for each of the forty-nine subareas; these described the manner in which the City would begin providing services to the Northwest territory upon annexation.

Other than the provision of utilities, the proposed plan of service for each of the forty-nine subareas were identical in most ways. Each provided in pertinent part:

A. <u>Police</u>

1. Patrolling, radio response to calls, and other routine police services using present personnel and equipment will be provided on the effective date of annexation.

2. As the area described above begins to develop and population increases, additional police personnel and patrol cars will be added, if needed, to maintain the present level of police service throughout the city, including the newly annexed area.

B. <u>Fire</u>

1. Fire protection will be provided by the Jackson Fire Department supported by the Madison County Volunteer Fire Department under an existing mutual aid agreement between said departments.

2. Fire protection for the area will be accomplished using present personnel and equipment on the effective date of annexation.

\* \* \* \*

I. <u>Streets</u>

1. Once developed, routine maintenance on the same basis as in the present city will begin in the annexed area, if applicable, when funds from the state gasoline tax, based on the annexed population, are received by the city (usually July 1 following the effective date of annexation).

2.  If needed reconstruction and resurfacing of streets, reconstruction of curb and gutter, and other such major improvements will be accomplished under current city policy.

3.  Appropriate street name signs will be installed as needed.

* * * *

L.      Street Lights

1.  Street lights will be installed in the area as it develops to a level determined to warrant such installation.

M.      Recreation

1.  The same standards and policies now used in the present city will be followed in expanding the recreational program and facilities in the enlarged city.

In August 2006, the Planning Department's report was completed, and Director Pilant presented the information to the City Planning Commission at the Commission's regular session. The meeting was open to the public and appropriate notice was given. The Planning Commission reviewed the information and recommended approval of the annexation and the plans of service for the territory to be annexed. Thereafter, the Planning Department prepared a written memorandum, informing Mayor Farmer and Defendant/Appellee the City of Jackson, Tennessee City Council ("City Council") of the decision of the Planning Commission. The memorandum included the minutes of the meeting and the documents reviewed by the Commission.

In September 2006, the City Council met to consider annexation of the Northwest territory. Because the Planning Department had divided the territory to be annexed into forty-nine subareas, the annexation was presented as forty-nine ordinances with a corresponding plan of service for each subarea. The City Council meeting was open to the public. After the City Council heard comments by members of the public in attendance, it approved the plans of service and passed the annexation ordinances on first reading.

On October 3, 2006, the City Council met to consider the annexation ordinances on second reading.[3] The City Council again voted in favor of annexing the Northwest territory and the

_____

[3]Under the City's Charter, in order to be adopted, a City ordinance must be passed at two City Council
(continued...)

forty-nine ordinances were adopted with an effective date of November 2, 2006. By resolution, the City Council adopted the corresponding plans of service.[4]

On November 1, 2006, Plaintiff/Appellant Southwest Tennessee Electric Membership Corporation and roughly ninety-seven other persons who own property in the area to be annexed (collectively, "Plaintiffs") filed a *quo warranto* lawsuit challenging the annexation of forty-seven subareas,[5] on numerous grounds. First, the Plaintiffs argued that annexation of the subareas that are not contiguous to the existing City boundary was illegal because Tennessee Code Annotated § 6-51-102(a)[6] permits the City to annex only land that adjoins its existing boundaries. Next, the Plaintiffs alleged that the City did not comply with the statutory procedural requirements for annexation "in regard to the content, submission, and approval of the respective plans of service." In particular, they asserted that the plans of service were fatally deficient for lack of a "projected timing of the services," as required under Tennessee Code Annotated § 6-51-102(b)(1).[7] Finally, in reference to Tennessee Code

---

[3](...continued)
meetings.

[4]The record is not clear as to whether the resolutions for the plans of service were adopted at the September or October 2006 City Council meetings.

[5]Initially, the Plaintiffs challenged the annexation of forty-seven subareas, but only thirty-three remain at issue on appeal. The owners of property in two of the subareas voluntarily dismissed their claims. Consent orders of dismissal were entered as to the owners of property in two other subareas. During the pendency of the case, the City repealed the ordinances that annexed five of the subareas. Finally, the trial court granted the City partial summary judgment as to five additional subareas, based on its finding that none of the Plaintiffs in these subareas had standing to contest the annexation in a *quo warranto* proceeding. The trial court certified the order as final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. After the trial court denied the Plaintiffs' motion to alter or amend the order, the Plaintiffs filed a notice of appeal, appealing the grant of partial summary judgment to the City on standing grounds.

In the complaint, the Plaintiffs asserted claims for declaratory judgment and violation of the Open Meetings Act, Tennessee Code Annotated § 8-44-101, *et seq*. The trial court found that the relief available to the Plaintiffs was limited to a *quo warranto* proceeding and that the Open Meetings Act claim was without merit, and so granted the City summary judgment on both claims. On appeal, the Plaintiffs do not raise any issues pertaining to the grant of summary judgment on their declaratory judgment and Open Meetings Act claims.

[6]Tennessee Code Annotated § 6-51-102(a) provides: "A municipality, . . . may extend its corporate limits by annexation of such territory adjoining its existing boundaries . . .." T.C.A. § 6-51-102(a)(1) (2005 & 2009 Supp.).

[7]Tennessee Code Annotated § 6-51-102(b) provides: "Before any territory may be annexed under this section,
(continued...)

-5-

Annotated § 6-58-111(a),[8] they also claimed that annexation was illegal because it did not reasonably appear that the prosperity of the communities involved would be materially retarded in the absence of annexation, or that the safety or property of the inhabitants of the annexed areas was endangered. They asserted that the annexation was unreasonable considering the overall well-being of the involved communities. On these grounds, the Plaintiffs requested that the ordinances be declared null and void and that the City be prohibited from annexing the Northwest territory for two years.

The City answered the complaint and denied that it had violated any statutes in annexing the Northwest territory. The City contended that, under Tennessee Code Annotated § 6-58-111, the annexation was presumed reasonable because the territory to be annexed was within the

---

[7](...continued)
the governing body of the municipality shall adopt a plan of services establishing at least the services to be delivered and the projected timing of the services." T.C.A. § 6-51-102(b)(1) (2005 & 2009 Supp.).

[8]Tennessee Code Annotated § 6-58-111(a) provides:

> (a) Notwithstanding any provision of this title or any other law to the contrary, a municipality possesses exclusive authority to annex territory located within its approved urban growth boundaries; therefore, no municipality may annex by ordinance or by referendum any territory located within another municipality's approved urban growth boundaries. Within a municipality's approved urban growth boundaries, a municipality may use any of the methods in chapter 51 of this title to annex territory; provided, that if a quo warranto action is filed to challenge the annexation, the party filing the action has the burden of proving that:
>
> (1) An annexation ordinance is unreasonable for the overall well-being of the communities involved; or
>
> (2) The health, safety, and welfare of the citizens and property owners of the municipality and territory will not be materially retarded in the absence of such annexation.

T.C.A. § 6-58-111(a) (2005 & 2009 Supp.).

City's urban growth boundary.[9]  Accordingly, the City sought dismissal of the Plaintiffs' complaint.[10]  Discovery ensued.

In September 2008, the Plaintiffs filed a motion for judgment on the pleadings with respect to the subareas that do not adjoin the existing City boundaries.  After a hearing, the trial court concluded that annexation of the non-adjoining subareas did not violate the pertinent statutes because the non-adjoining subareas are contiguous to the subareas that do adjoin the City's boundary, and all of the subareas were annexed simultaneously. Accordingly, the trial court denied the Plaintiff's motion.

In April 2009, the trial court held a two-day bench trial on the Plaintiffs' complaint.  Twelve witnesses testified, including three individual Plaintiffs, a municipal planning expert, and various City officials.  Sixteen exhibits were entered into evidence, including several maps and the Planning Department's report on the annexation.

Plaintiffs Mona Miller, Hoyt Hayes, and Norville Edwards, II, testified on their own behalf. Each live in one of the subareas to be annexed and testified that they believe that the services provided by the County are superior to the services provided by the City.  Mr. Edwards summed up the Plaintiffs' opinion that the Northwest territory annexation was unreasonable: "All they're going to do is tax us, take our money, and provide us no additional services than we have now."

Municipal planner Judson Te Paske testified as an expert witness for the Plaintiffs.  Mr. Te Paske commented overall that, while cities should expand via annexation, the annexation must be done responsibly by providing services to aid the transition from rural to urban. After reviewing the City's proposed plans of service for the territory to be annexed, he concluded that the subject annexation was not reasonable due to a "lack of commitment for providing necessary services."  He explained that the plans of service for the subareas to be annexed did not obligate the City to spend any additional monies to provide services to the Northwest territory, other than for garbage collection, for which the costs could ultimately

_____

[9]Enacted in 1998, Tennessee's "Comprehensive Growth Plan," Tennessee Code Annotated § 6-58-101 *et seq.*, "requires the local governments in each county to develop a county growth plan through a coordinating committee." ***State ex rel. Tipton v. City of Knoxville***, 205 S.W.3d 456, 459 (Tenn. Ct. App. 2006).  Under these statutes, the coordinating committee devises a plan that allocates the county's unincorporated land; once a local government planning advisory committee approves the plan, in general, a municipality within the county may annex only territory within its agreed-upon urban growth boundary.  ***Id.*** at 460.

[10]The City asserted a counterclaim against four of the Plaintiffs for breach of contract and inducement of breach of contract.  The parties ultimately settled these claims and an agreed order of dismissal was entered on the counterclaim.  No issues on appeal have been raised with respect to the City's counterclaim.

be recouped by charging garbage fees to the residents in the annexed areas. Mr. Te Paske pointed out that servicing the Northwest territory, as well as the City, with existing personnel and equipment would dilute the City's capacity to serve both communities.

To prepare for his testimony, Mr. Te Paske viewed the subareas in the Northwest territory to be annexed. He described the territory as "quite diverse" with some fully developed residential areas and some essentially vacant areas, characterizing the territory "[i]n general, [to be] a very thriving, . . . prosperous and nice place to live." Mr. Te Peske said that he had not observed anything indicating that the prosperity of the territory would be materially retarded in the absence of annexation. He admitted, however, that "not only was [it] time to annex but probably past the time" in his opinion. He conceded that, in preparation for his testimony, he did not review either the Planning Department's complete annexation plan or the minutes of the Planning Commission meeting. This testimony concluded the Plaintiffs' case in chief.

The City called as a witness the Chief of its Police Department, Richard Staples ("Chief Staples"). At Director Pilant's request, Chief Staples assessed the resources that would be required to provide the Police Department's services to the Northwest territory if it were annexed. To do so, he reviewed the territory's size, roadways, population base, demographic information, and current crime rate. Based on the data gathered, Chief Staples initially determined that, in addition to his current resources, the Police Department would need twelve officers, three patrol cars, two investigators, and two investigative cars, at a cost of about $739,000. This initial assessment was later revised downward in light of a decrease in the size of the area to be annexed; the later assessment was that only nine additional officers and one additional investigator would be required. After the City Council passed the annexation ordinances, Chief Staples said, he hired twenty-two officers, and he testified that he had authorization to hire nine more. Based on all of these facts, Chief Staples testified that the Police Department could provide adequate police protection to the Northwest territory and to the City twenty-four hours per day with its current resources

In his testimony, Chief Staples compared the City's Police Department with the Madison County Sheriff's Department, which was providing the police protection for the area to be annexed at the time of trial. He said that the City had "[a] lot more" officers on patrol than did the Sheriff's Department, in an area one-tenth of the County's size. In addition, the City Police Department has resources that the County Sheriff's Department presumably does not have, such as a forty-member special operations division to address narcotics and street crimes, a six-member tactical team, over twenty investigators, and officers who work night shifts. Based on the statistical data, Chief Staples said, the City Police Department responds to calls "about two-thirds quicker" than does the County Sheriff's Department. Chief Staples

noted that, because of the irregular City boundary abutting the area to be annexed, the City Police Department was already patrolling parts of the Northwest territory.

Chief Staples acknowledged that he had not reviewed the City's proposed plans of service for the areas to be annexed. He clarified that the twenty-two officers hired after the annexation ordinances passed were not hired for the express purpose of providing services to the Northwest territory, but said that the City Mayor was aware and had agreed to provide the additional resources once the annexation became effective.

The City next proffered the testimony of representatives of the Jackson Energy Authority ("JEA"). They testified that JEA was already providing services to portions of the Northwest territory, and that JEA's rates for electricity and natural gas were significantly less than the energy provider for Madison County outside of the City.

The Chief of the City Fire Department, James Pearson ("Chief Pearson"), testified as well. At the outset, Chief Pearson said that, when the Planning Department decided to annex the territory, he was not the Chief of the Fire Department. To service the Northwest territory, his predecessor had recommended that the City build a new fire station, purchase a new fire engine, and hire fifteen additional firefighters at an estimated cost of one million dollars. Chief Pearson testified that the City could serve the territory to be annexed by using resources from two preexisting fire stations. Once the annexation became effective, Chief Pearson said, the Fire Department had been authorized to buy new equipment, build a new fire station, and hire additional firefighters.

In his testimony, Chief Pearson compared the City Fire Department to the Madison County Fire Department. The County relies on volunteer firefighters who must assemble at the fire station before leaving to fight a fire, while the City has a dedicated firefighting force on call at the fire stations. The City firefighters enter structure fires to extinguish blazes from the interior while the county firefighters do not. Chief Pearson noted that the City Fire Department provides services presumably not provided by the County such as fire inspections, public fire education, first responder medical services, vehicle extrication, and technical rescue services. Chief Pearson acknowledged that he had not seen the City's proposed plans of service for the territory to be annexed, and conceded that serving both the City and the annexed territory with existing resources would temporarily dilute the fire coverage until the City Fire Department acquired the additional resources that had been authorized.

The City then called the Director of the City Recreation and Parks Department, Anthony Black ("Director Black"), to testify. Director Black described the parks and recreation activities that the Department provides, noting that persons residing outside the City limits

are charged a higher fee for some activities such as the softball league. Director Black said that the City Recreation and Parks Department was not contacted by the Planning Department as part of the preparation of the City's proposed plans of service, and, at the time of trial, there were no plans for adding a park or recreation center.

The Director of the City Planning Department, Director Pilant, testified next. At the outset, Director Pilant said that the Northwest territory lay almost entirely within the City's urban growth boundary. He explained that the northwestern municipal boundary had grown to be irregularly shaped over the years as the City granted real estate developers' annexation requests. As early as 1989, the Planning Department had studied the territory for annexation, and the ultimate decision to annex was based in part on the City's desire to "fix the geography" to enable the City to more easily provide services within the City limits. To make the annexation process more manageable, the Planning Department divided the Northwest territory into forty-nine subareas. Director Pilant admitted that subareas 2, 3, 4, 5, 7, 11, 17, 31, 32, 35, 36, 37, 39, and 40 do not immediately adjoin the City's existing boundary, but he pointed out that these subareas are contiguous to the subareas that do immediately adjoin the City's existing boundary.

Once the City decided that annexation was desirable, the Planning Department began analyzing the territory, with particular focus on the revenues and expenses associated with annexation. Director Pilant asked the head of each City department[11] to furnish him with the estimated cost of providing services to the territory to be annexed. Utilizing this information, Director Pilant developed a ten-year plan for the annexation that showed the annexation would initially produce deficits for the City, but would become profitable after a decade. In general, the plan called for the City to provide services with existing resources immediately after the annexation, and gradually add resources to each department over a ten-year period. Director Pilant explained:

> The nature of annexation and the nature of the effective dates, it's difficult to have personnel and equipment as torpedoes ready to go. So there was provisions made [sic] for the effective date of annexation. There was also divisions [sic] for pursuing the new construction . . . and hiring additional personnel, . . ..

Director Pilant conceded that the City's proposed plans of service did not contain the level of detail that was found in the Planning Department's ten-year annexation plan. Although the specific recommendations of the various department heads were not included in the text

---

[11]Director Pilant conceded that he did not initially contact the head of the Parks and Recreation Department, but said that he consulted with that Department in developing the City's overall annexation plan.

of the plans of service, Director Pilant insisted that the recommendations were "a part of the [overall annexation] plan." He emphasized that the details of the Planning Department's analysis were made public throughout the annexation process.

Director Pilant admitted that all forty-nine plans of service used the same wording for the provision of certain services, and that the plans of service did not obligate the City to expend additional funds to provide services to the annexed territory. He insisted, however, that the additional expenditures are "part of [the City's] plan." Director Pilant maintained that annexation of the Northwest territory would benefit the residents of both the annexed territory and the City.

The City's final witness was Mayor Jerry Gist. Mayor Gist was not the City's mayor when the City Council passed the annexation ordinances, but he agreed that the annexation was reasonable and necessary for both communities. Mayor Gist noted that the Northwest territory lay within the City's urban growth boundary, and pointed out that the residents of the Northwest territory already use the City's services in that they visit the City's parks.

At the close of the testimony, the trial court took the case under advisement. On April 7, 2009, the trial court informed the parties of its ruling in a letter addressed to counsel.

In the letter, the trial court first noted that a plaintiff challenging a municipality's annexation within its urban growth boundary bears the burden of proving either (1) that the annexation "is unreasonable for the overall well-being of the communities involved;" or (2) that the "health, safety, and welfare of the citizens and property owners of the municipality and territory will not be materially retarded in the absence of such annexation." After considering all of the evidence in light of these standards, the trial court concluded that the Plaintiffs had not carried their burden of proof. First, the trial court found that the Northwest territory residents have a need for, or actually use, the City's services. As to the City's ability and intent to provide services to the area, the trial court noted that the annexation statutes require a plan of service with "a projected timing of the services and that it be reasonable." The trial court concluded that the City's proposed plans of service satisfy the statutory requirements. Lastly, the trial court found that the City has numerous reasons for the annexation beyond simply increasing tax revenues, including:

> (1) enhanced fire and police protection; (2) less expensive access to recreational facilities; (3) street maintenance and street lights; (4) desirability of annexing territory adjacent to the City similar in density and use; (5) enhanced ability to provide utility services as properties continue to develop; (6) implementation of the growth plan; (7) the fact that the area is already a *de facto* part of the City; (8) necessity to control development in the City's fringe

areas; (9) to enhance the probability of the orderly growth of the City; (10) helping to guarantee consistent land use in the area; and (11) the City's responsibility.

Based on all of this evidence, the trial court found "abundant evidence" that the Northwest territory would benefit from annexation, and that annexation would be "a benefit to both [communities] and a detriment to neither." Accordingly, the trial court found that the Plaintiffs had not carried their burden of proof and dismissed the complaint.

On April 20, 2009, the trial court entered an order consistent with its letter ruling. The Plaintiffs now appeal.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, the Plaintiffs raise the following issues:

1. Whether the trial court erred in determining that the City can legally annex non-adjoining areas;

2. Whether the trial court erred in determining that the City properly passed the subject annexation ordinances;

3. Whether the trial court erred in determining that the City properly passed a reasonable plan of service containing a reasonable implementation schedule;

4. Whether the trial court erred in determining that the City has authority to annex pursuant to Tennessee Code Annotated § 6-51-102(a)(1);

5. Whether the trial court erred in determining that the annexations are reasonable; and

6. Whether the trial court erred in determining that the health, safety and welfare of the citizens and property owners of both the municipality and annexation areas would be materially retarded in the absence of annexation.

As this case was tried in a bench trial, we review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); ***Campbell v. Fla. Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996). The trial court's conclusions of law are reviewed *de novo* without a presumption of correctness.

***Campbell***, 919 S.W.2d at 35 (citing ***Hillsboro Plaza Enters. v. Moon***, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993)).

**ANALYSIS**

***Non-Adjoining Subareas***

The Plaintiffs assert first that the trial court erred in upholding the annexation of the subareas that are not contiguous with the City's existing boundary at the time of annexation. Based on the language in Tennessee Code Annotated § 6-51-102(a), the Plaintiffs contend that the City may lawfully annex only "territory adjoining its existing boundaries." T.C.A. § 6-51-102(a)(1) (2005 & 2009 Supp.). In support of their contention, the Plaintiffs cite to ***Town of Bartlett v. City of Memphis***, 482 S.W.2d 782 (Tenn. Ct. App. 1972).

In response, the City points out that all of the subareas are contiguous to one another, and that some of them adjoin the City's boundary as it existed at the time of annexation. Because all of the subareas were annexed simultaneously, the City contends that it has sufficiently complied with the contiguity requirement of Section 6-51-102. Citing *American Law Reports*, *American Jurisprudence*, and ten cases from other jurisdictions, the City asserts that "[i]t is widely accepted that the annexation of multiple tracts is sufficient to meet the requirements of contiguity as long as one of the tracts is adjacent to the municipality and all of the tracts are adjacent to each other."

In the case at bar, it is undisputed that the land to be annexed is within the City's urban growth boundary. Consequently, Tennessee Code Annotated § 6-58-111 governs the instant *quo warranto* challenge to the annexation. ***State ex rel. Tipton v. City of Knoxville***, 205 S.W.3d 456, 461 (Tenn. Ct. App. 2006). Under Section 6-58-111(a), a municipality may annex territory within its urban growth boundary by any manner prescribed in Tennessee Code Annotated § 6-51-101 *et seq.* ***See*** T.C.A. § 6-58-111(a) (2005 & 2009 Supp.).

In this case, the land was annexed by ordinance, and thus the annexation is governed by Tennessee Code Annotated § 6-51-102(a)(1), which provides:

> A municipality, . . . upon its own initiative when it appears that the prosperity of such municipality and territory will be materially retarded and the safety and welfare of the inhabitants and property endangered, after notice and public hearing, by ordinance, may extend its corporate limits by annexation of such territory adjoining its existing boundaries as may be deemed necessary for the welfare of the residents and property owners of the affected territory as well

-13-

as the municipality as a whole; provided, that the ordinance shall not become operative until thirty (30) days after final passage thereof.

T.C.A. § 6-51-102(a)(1) (2005 & 2009 Supp.). Thus, a municipality may annex land by ordinance, provided that the land to be annexed adjoins the municipality's existing boundaries and conditions warranting annexation are fulfilled.

Here, the City decided to divide the Northwest territory into forty-nine subareas and enact forty-nine annexation ordinances simultaneously. All of the subareas are contiguous to one another; however, some of the subareas do not immediately adjoin the City's boundary as it existed at the time the ordinances were passed. The issue, then, is whether the City has the authority under Section 6-51-102(a)(1) to annex subareas that do not immediately adjoin the City's boundary.

The City insists that this is an issue of first impression in Tennessee and directs our attention to the "widely accepted" position of our sister jurisdictions. We have reviewed the authorities cited by the City, and the underlying caselaw. Certainly the reasoning utilized has merit, from a policy standpoint. We note, however, that most of the cases that adopt the City's position turn on particular language in the state statute being interpreted. *See, e.g., City of Waukee v. City Dev. Bd.*, 590 N.W.2d 712, 717 (Iowa 1999) ("We agree . . . that the plain language of the first sentence in section 368.7(1) does not require that each parcel of property within the annexation area adjoin the city to which annexation is sought. . . . As mentioned, section 368.1(1) defines 'adjoining' to mean 'having a common boundary for not less than fifty feet,' and section 368.1(14) defines 'territory' to mean 'the land areas proposed to be ... annexed ... whether or not contiguous to all other areas to be ... annexed.' "); *City of Elkhorn v. City of Omaha*, 725 N.W.2d 792, 809 (Neb. 2007) ("The question remains, however, whether the 'adjoining city' language in § 14-117 required Omaha to have a common border with Elkhorn before annexing it. . . . [T]he terms 'contiguous' and 'adjoining' in § 14-117 are synonymous.").

More importantly, we find that this issue is not one of first impression. In *Town of Bartlett v. City of Memphis*, 482 S.W.2d 782 (Tenn. Ct. App. 1972), this Court addressed a somewhat similar situation. In that case, the defendant City of Memphis passed an ordinance in 1968 to annex an area known as "Raleigh," with an effective date in 1972. *Town of Bartlett*, 482 S.W.2d at 783. At the time the annexation ordinance was passed, Raleigh apparently adjoined the existing Memphis City limit. Meanwhile, in the interim before the effective date of the Raleigh annexation, the City of Memphis and the Town of Bartlett engaged in an apparent "race" to annex an area known as "Elmore Park." Elmore Park adjoined the Raleigh area that was the subject of the Memphis annexation ordinance, but did

-14-

not adjoin the Memphis City limits as they existed at the time, because the Raleigh annexation had not yet become effective.

In April 1970, the Town of Bartlett enacted an ordinance annexing Elmore Park. *Id.* at 782. In July of the same year, Memphis amended the 1968 ordinance that had annexed Raleigh to include the annexation of Elmore Park as well. *Id.* at 783. Thereafter, Bartlett filed a lawsuit challenging Memphis's annexation of Elmore Park. The trial court entered judgment for Bartlett, and Memphis appealed.

On appeal, the appellate court reviewed the operative language of Tennessee Code Annotated § 6-309, which has since been re-numbered as Section 6-51-102(a)(1).[12] The statute states that a municipality, by ordinance, "may extend its corporate limits by annexation of such territory [a]djoining its existing boundaries as may be deemed necessary...." *Id.* at 784. The Court in *Town of Bartlett*, based on this language, concluded that the City of Memphis lacked the authority to annex the Elmore Park area "because that territory [Elmore Park] did not at the time of the procedures being reviewed, . . . , adjoin the existing boundaries of the City of Memphis." *Id.* at 784. It found further that the attempt by Memphis to annex Elmore Park by amending the prior ordinance that had annexed Raleigh amounted to a "circumvent[ion] [of] the clear legislative mandate" of contiguity. *Id.* Consequently, the appellate court in *Town of Bartlett* determined that the attempted annexation of Elmore Park by the City of Memphis was void, and upheld the trial court's ruling in favor of the Town of Bartlett. *Id.*

Similar to the City of Memphis in *Town of Bartlett*, the City in this case seeks to annex land that does not immediately adjoin its boundary as it existed at the time of the annexation. The *Town of Bartlett* decision interpreted Tennessee Code Annotated § 6-51-102(a)(1) as authorizing only the annexation by ordinance of a territory that adjoins the municipality's boundary at the time of the annexation. The City urges that the facts in the instant appeal are distinguishable from those in *Town of Bartlett* because, in this case, all of the subareas were annexed simultaneously. We cannot agree. In *Town of Bartlett*, Memphis sought to annex land that did not adjoin its existing boundary by amending the ordinance that had previously annexed adjoining land, and the court in *Town of Bartlett* rejected this as an attempt to

----

[12]Section 6-309, as quoted in *Town of Bartlett*, is identical in pertinent part to now-Section 6-51-102(a)(1), with one exception. The *Town of Bartlett* opinion quotes Section 6-309 as providing that the municipality may annex when it appears that "the safety and welfare of the inhabitants and property *thereof* endangered. ..." *Town of Bartlett*, 482 S.W.2d at 784. The Tennessee Code Annotated does not indicate an amendment to the statute in this respect, so this may be an error in the opinion. At any rate, it does not affect our reasoning.

"circumvent the clear legislative mandate" of contiguity under the statute. **Id.** We find this controlling.

If we were interpreting Section 6-51-102(a)(1) on a blank slate, we might agree with the City's proposed interpretation. We are not. For over thirty years since the Court in ***Town of Bartlett*** interpreted the statute, the statutory language has remained intact. "[T]he fact that the legislature has not expressed disapproval of a judicial construction of a statute is persuasive evidence of legislative adoption of the judicial construction," because "[t]he legislature is presumed to know the interpretation which courts make of its enactments." ***Hamby v. McDaniel***, 559 S.W.2d 774, 776 (Tenn. 1977) (citing ***Missouri v. Ross***, 299 U.S. 72 (1936); ***Stern v. Miller***, 348 So.2d 303 (Fla.1977); ***Walling v. Brown***, 76 P. 318 (Idaho 1904); ***Bottomly v. Ford***, 157 P.2d 108 (Mont. 1945); ***Hargrove v. Newsome***, 470 S.W.2d 348 (Tenn. 1971); ***Krohn v. Richardson-Merrell, Inc.***, 406 S.W.2d 166 (Tenn. 1966); ***McKinney v. Hardwick Clothes, Inc.***, 398 S.W.2d 265 (Tenn. 1966); ***Cunningham v. Cunningham***, 40 S.W.2d 46 (Tex. 1931)); ***accord Freeman Indus., LLC v. Eastman Chem. Co.***, 172 S.W.3d 512 (Tenn. 2005). Accordingly, we find the fact that Section 6-51-102(a)(1) has not been altered in the decades since the ***Town of Bartlett*** decision was rendered to be indicative of the Legislature's adoption of the interpretation made by the ***Town of Bartlett*** Court.

In light of the interpretation of Section 6-51-102(a)(1) in ***Town of Bartlett***, we must conclude that the trial court erred in finding that the City can lawfully annex the subareas that do not immediately adjoin the City's boundary as it existed at the time the City Council passed the annexation ordinances.

### *Adjoining Subareas*

With respect to the subareas that adjoin the City's existing boundary, the Plaintiffs argue that the City failed to comply with the statutory requirements for annexation because the proposed plans of service do not include timetables or specific dates for "installing street lights, building a fire station, purchasing park land, etc.," and thus do not contain a "reasonable implementation schedule" as required by Tennessee Code Annotated § 6-51-102(b)(3). The Plaintiffs further assert that the annexation is invalid because the Planning Commission did not prepare a written report on the plans of service prior to enactment of the annexation ordinances, in accordance with Tennessee Code Annotated § 6-51-102(b)(4).

Beyond the City's purported failure to adhere to the statutory requirements, the Plaintiffs argue that the trial court erred in upholding the annexation because the evidence shows the annexation was unreasonable. The Plaintiffs contend that the evidence shows that the health, safety, and welfare of the communities involved will not be materially retarded in the

absence of annexation. They insist that the annexation was not part of a comprehensive planning process. They contend that the omission of any financial commitment to provide services in the plans of service indicates that the City does not intend to render needed services. The Plaintiffs emphasize that the fact that the City's plans of service do not include City department recommendations involving additional costs shows that the City's motivation for the annexation was solely a desire to increase the City's tax revenues. For these reasons, the Plaintiffs ask this Court to hold that the annexation ordinances are invalid.

In response, the City argues that the Plaintiffs cannot predicate their *quo warranto* challenge on procedural defects in the annexation process. However, in the event that this Court finds it necessary to address the adequacy of the plans of service, the City contends that we may consider pertinent trial testimony in conjunction with the documents themselves, citing ***State ex rel. Sexton v. Town of Huntsville***, No. 03A01-9112-CV-00438, 1992 WL 109423 (Tenn. Ct. App. May 26, 1992). Under Tennessee Code Annotated § 6-58-111(a), because the Northwest territory lies within the City's urban growth boundary, the City contends that the Plaintiffs have the burden of proving either (1) that the annexation is "unreasonable for the overall well-being" of both the City and the subareas, or (2) that "[t]he health, safety, and welfare of the citizens and property owners" of both communities "will not be materially retarded in the absence of such annexation." T.C.A. § 6-58-111(a) (1)-(2) (2005 & 2009 Supp.). The City contends that the Plaintiffs have failed to prove either statutory ground, and in fact the evidence shows that the annexation is reasonable and a benefit to both communities involved.

As background, we briefly recap the evolution of annexation in Tennessee. Prior to 1955, Tennessee's Legislature had the exclusive authority to alter municipal boundaries within the State. ***Highwoods Props., Inc. v. City of Memphis***, 297 S.W.3d 695, 703 (Tenn. 2009) (citing ***Willett v. Bellville Corp.***, 79 Tenn. 1, 5 (1883)). The Legislature's power in this regard was so broad that "an individual subject to a validly-enacted annexation had no legal avenue through which to oppose it." ***Id.*** (citing ***McCallie v. Mayor & Aldermen of Chattanooga***, 40 Tenn. (3 Head) 317, 321 (1859)).

In 1955, the Legislature enacted chapter 113 of the public acts of 1955, now codified at Tennessee Code Annotated § 6-51-101, *et seq.*, granting to municipalities the authority to alter their own boundaries through annexation by ordinance. ***Id.*** at 704. In connection with this grant of authority to municipalities, the Legislature provided property owners with an avenue for challenging a municipality's annexation of land by timely filing a *quo warranto* action alleging that the annexation was not reasonably necessary for the welfare of the communities involved. ***Id.*** at 705 (quoting Act of Mar. 1, 1955, § 2(b)). Noting that the Legislature "could have delegated to the municipalities the authority to annex with no right of judicial review absent constitutional restraint," our Courts have consistently held that the

statutory right to challenge an annexation is very limited. ***Id.*** at 707-08 (citing ***State ex rel. Bastnagel v. City of Memphis***, 457 S.W.2d 532, 534 (Tenn. 1970); ***Brent v. Town of Greeneville***, 309 S.W.2d 121, 123 (Tenn. 1957)).

The Courts' "entire jurisdiction and authority" to review annexations is contained within the four corners of the statute. ***Id.*** at 708 (quoting ***City of Oak Ridge v. Roane County***, 563 S.W.2d 895, 897 (Tenn. 1978)). The scope of judicial review of annexation has consistently been narrowly construed; because the statute does not grant the authority to vacate an annexation for procedural defects, the Courts have no power to do so. ***Id.*** (citing ***City of Watauga v. City of Johnson City***, 589 S.W.2d 901, 906 (Tenn. 1979)). In the past, our Supreme Court has determined that errors in notice, public hearings and plans of service fall within the ambit of "procedural defects." ***City of Watauga***, 589 S.W.2d at 905. In view of the limited scope of judicial review, "the general rule is that defects in an annexation ordinance must be presented in the context of a challenge to its reasonableness or necessity by way of a timely *quo warranto* challenge." ***Highwoods Props., Inc.***, 297 S.W.3d at 708 (citing ***City of Oak Ridge***, 563 S.W.2d at 898; ***City of Knoxville v. State ex rel. Graves***, 341 S.W.2d 718, 721 (Tenn. 1960)).

We consider the issues in this appeal in light of these parameters. The Plaintiffs challenge the City's annexation of the immediately adjoining subareas by asserting defects in the plans of service and the planning commission's failure to prepare a written report. The ***Highwoods Properties, Inc.*** and ***City of Watauga*** decisions make it clear that we are not to consider such alleged procedural defects in isolation; rather, they are viewed in the context of the statutory grounds for challenging an annexation. Because the Northwest territory lies within the City's urban growth boundary, Tennessee Code Annotated § 6-58-111(a) governs the Plaintiffs' *quo warranto* challenge to the annexation. ***State ex rel. Tipton v. City of Knoxville***, 205 S.W.3d 456, 461 (Tenn. Ct. App. 2006). Thus, the allegations of procedural defects are considered under the grounds for challenging an annexation set forth in Section 6-58-111(a).

Tennessee Code Annotated § 6-58-111(a) provides:

> [I]f a quo warranto action is filed to challenge the annexation, the party filing the action has the burden of proving that:
> (1) An annexation ordinance is unreasonable for the overall well-being of the communities involved; or
> (2) The health, safety, and welfare of the citizens and property owners of the municipality and territory will not be materially retarded in the absence of such annexation.

-18-

T.C.A. § 6-58-111(a) (2005 & 2009 Supp.). Thus, a party asserting a *quo warranto* challenge to an annexation within a municipality's urban growth boundary must show either that the annexation is unreasonable for the well-being of the communities involved or that the health, safety, and welfare of the communities involved will not be materially retarded in the absence of annexation. The Plaintiffs contend that they have established both grounds. We consider each in turn.

"While other factors may be considered, the primary test of the reasonableness of an annexation ordinance must be the planned and orderly growth and development of the city, taking into consideration the characteristics of the existing city and those of the area proposed for annexation." *State ex rel. Collier v. City of Pigeon Forge*, 599 S.W.2d 545, 548 (Tenn. 1980); *accord Cox v. City of Jackson*, No. 02A01-9701-CH-00002, 1997 WL 777078, at *4 (Tenn. Ct. App. Dec. 18, 1997), *perm. app. denied* June 22, 1998. Factors to be considered in assessing the reasonableness of an annexation include:

> a. the necessity for, or use of, municipal services;
> b. the present ability and intent of the municipality to render municipal services when and as needed; [and]
> c. whether the annexation is for the sole purpose of increasing municipal revenue without the ability and intent to benefit the annexed area by rendering municipal services.

*Town of Oakland v. Town of Somerville*, No. W2002-02301-COA-R3-CV, 2003 WL 22309498, at *5 (Tenn. Ct. App. Oct. 7, 2003), *perm. app. denied* Mar. 22, 2004 (citing *City of Kingsport v. State ex rel. Crown Enters., Inc.*, 562 S.W.2d 808, 812 (Tenn. 1978); *Saylors v. City of Jackson*, 575 S.W.2d 264, 266 (Tenn. 1978)).

We apply these factors to the case at bar and begin with the necessity for, or use of, municipal services. The evidence shows that the territory to be annexed currently uses some of the City's services. The witnesses testified that parts of the annexed area already receive utilities from the City's utility provider, and that residents of the territory have access to the City's parks and recreational activities. Additionally, the City Police Department already patrols parts of the annexed territory.

The second factor is the municipality's intent to render services to the annexed area. The Plaintiffs contend that the lack of specificity and commitment to spend funds to provide services in the City's proposed plans of service shows clearly that the City does not intend to deliver services to the annexed territory. We agree that the plans of service are spare. However, we consider the testimony presented at trial as well as the written plans of service. *See State ex rel. Sexton v. Town of Huntsville*, No. 03A01-9112-CV-00438, 1992 WL

109423, at *2 (Tenn. Ct. App. May 26, 1992). Director Pilant's lengthy testimony directly addressed the City's ten-year plan for annexation. His testimony was corroborated by that of Police Chief Staples, Fire Chief Pearson, and Mayor Gist; each indicated that the City has budgeted additional resources to provide services to the annexed territory once the annexation is effective.

The Plaintiffs contend that they established the third factor, that is, that the City's plans of service show that the City's sole intent is to increase its tax revenues. We must respectfully disagree. Director Pilant testified clearly that the City sought to annex the territory to correct its irregular boundary and to bring developed areas into the City. Importantly, he noted that he had calculated that the cost of annexation would exceed any tax revenues gained for nearly a decade. In addition, Mayor Gist testified that the annexation was effected to ensure that the City would continue to thrive for the benefit of the entire region.

On the whole, the evidence presented at trial shows that the annexation is part of the City's plan for orderly growth. The Plaintiffs' own expert witness conceded that it "was time" to annex the Northwest territory and probably "past the time" for some of the areas, given their stage of development. Director Pilant detailed an annexation planning process that spanned decades. Against this backdrop, we cannot say that any failure by the Planning Commission to prepare a written report on the eve of enactment renders the annexation unreasonable. Under the circumstances, we must conclude that the trial court correctly determined that the City's annexation of the Northwest territory is not "unreasonable for the overall well-being of the communities involved." T.C.A. § 6-58-111(a)(1) (2005 & 2009 Supp.).

The Plaintiffs also contend that the evidence supports their challenge under subsection (2) of the statute, which requires proof that "[t]he health, safety, and welfare" of both communities "will not be materially retarded in the absence of such annexation." T.C.A. § 6-58-111(a)(2) (2005 & 2009 Supp.). "[P]roving lack of material retardation necessarily requires proof that annexation will not materially benefit the municipality and territory." *State ex rel. Tipton v. City of Knoxville*, 205 S.W.3d 456, 462 (Tenn. Ct. App. 2006). Therefore, a party challenging an annexation under subsection (2) must "prove that annexation would not materially benefit the health, safety, and welfare of the citizens and property owners of the City and the affected territory." *Id.*

From our review of the record, we must conclude that the Plaintiffs have not carried their burden of showing that the annexation would not materially benefit both communities involved. To the contrary, once the annexation becomes effective, the evidence shows that the residents of the annexed areas will begin receiving superior police and fire protection, lower utility rates, and less expensive access to the City's recreational activities. It establishes that annexation will allow the City to continue to thrive as the economic center

of the surrounding region, to control the orderly growth of developing areas on the outskirts of the City, and to provide a more uniform, workable boundary for providing services to residents. Under these circumstances, the trial court did not err in determining that the Plaintiffs failed to carry the burden of proof.

## CONCLUSION

In sum, we reverse the trial court's decision upholding the annexation of the subareas that do not immediately adjoin the boundary of the City as it existed at the time the annexation ordinances were enacted. As to the subareas that immediately adjoin the City's boundary as it existed at the time the annexation ordinances were enacted, we affirm the trial court's finding that the annexation comports with the requirements of the applicable statutes and is reasonable.

The decision of the trial court is affirmed in part and reversed in part as set forth above, and the cause is remanded for proceedings consistent with this Opinion. The costs of this appeal are taxed one-half to the Appellants, Southwest Tennessee Electric Membership Corporation, *et al.*, and their surety, and one-half to the Appellees, City of Jackson, Tennessee and the City of Jackson, Tennessee City Council, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE

# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

**SOUTHWEST TENNESSEE ELECTRIC MEMBERSHIP CORPORATION, ET AL.**
**v.**
**CITY OF JACKSON, TENNESSEE and THE CITY OF JACKSON, TENNESSEE CITY COUNCIL**

**Appeal from the Chancery Court for Madison County**
**No. 64244**

_____

**No. W2009-00913-COA-R3-CV - Filed October 28, 2010**

_____

**ORDER ON PETITIONS TO REHEAR**

_____

After issuance of the Court's Opinion in this appeal, both the City and the Plaintiffs filed petitions to rehear. We address herein the issues raised by the parties.

In its petition to rehear, the City notes that Tennessee Code Annotated § 6-58-106(a)(1)(B) defines the entire urban growth area as territory contiguous to the existing boundaries of the subject municipality. Asserting that the word "contiguous" in T.C.A. § 6-58-106(a)(1)(B) is synonymous with the word "adjoining" in T.C.A. § 6-51-102(a)(1), the City now argues that the City's entire urban growth boundary area should be considered to be "adjoining" the municipality's existing boundaries within the meaning of T.C.A. § 6-51-102(a)(1).

From the Court's review of the City's brief, it appears that the City makes this argument for the first time in its petition to rehear. Nevertheless, we exercise our discretion to consider it. We respectfully decline to adopt the City's argument. The *City of Bartlett* case was decided in 1972, interpreting the very language at issue in this appeal. When Tennessee Code Annotated § 6-58-106 was enacted by the Legislature in 1998, the Legislature chose to leave intact the language in Section 6-51-1092(a)(1), with full knowledge of the Court's construction of this language in *City of Bartlett*. Moreover, the language in Section 6-58-106(a)(1)(B) does not indicate legislative intent to address and legislatively "reverse" the Court's decision in *City of Bartlett*. For these reasons, the City's argument must be rejected.

In the Plaintiffs' petition to rehear, they contend that the statutory requirements for the plans of service were not met. We find that the Plaintiffs' arguments on this issue were fully considered in the Court's Opinion, and decline to reconsider them.

The City further contends in its petition to rehear that subareas 4 and 5 are not at issue because the trial court found that the Plaintiffs lacked standing to challenge the annexation of these areas, and this holding was not appealed by the Plaintiffs. The City also contends in its petition to rehear that subarea 17 actually adjoins the City's existing boundaries.

In its Opinion, this Court held that the City cannot lawfully annex the subareas that do not immediately adjoin the City's boundary as it existed at the time the annexation ordinances were passed. This Court did not specify (a) which subareas are no longer at issue, by virtue of the trial court's unappealed rulings or otherwise, or (b) which subareas in fact immediately adjoin the City's boundary. To clarify, on remand, these issues may be considered by the trial court, in its discretion, and therefore will not be determined by this Court in response to the petitions to rehear.

We respectfully decline to adopt the remaining arguments set forth in the parties' petitions to rehear.

For the reasons set forth above, both parties' petitions to rehear are hereby **DENIED**.

It is **SO ORDERED**.

_____
HOLLY M. KIRBY, J.

_____
ALAN E. HIGHERS, P.J., W.S.

_____
J. STEVEN STAFFORD, J.